**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY T. DEFRANCESCO,

*Plaintiff-Appellant*,

v.

ROBERT C. ROBBINS, in his
individual capacity; MICHAEL D.
DAKE, in his individual capacity;
UNKNOWN PARTIES, named as and
does 1-10 inclusive,

*Defendants-Appellees*.

No. 23-16147

D.C. No.
4:20-cv-00011-
CKJ

OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted August 21, 2024
San Francisco, CA

Filed May 7, 2025

Before: Marsha S. Berzon, Daniel A. Bress, and Lawrence
VanDyke, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Berzon

# SUMMARY[*]

## First Amendment/Qualified Immunity

The panel affirmed the district court's dismissal on qualified immunity grounds of Anthony DeFrancesco's complaint alleging that he was harassed and then fired from his position as the Senior Director of Operations at the University of Arizona Health Sciences division ("UAHS") in retaliation for his husband's whistleblowing speech, in violation of the First Amendment.

DeFrancesco's husband, who had earlier also held a high position at the University of Arizona as Senior Vice President and Chief Financial Officer, opposed the UAHS's hiring of Michael Dake to serve as UAHS Senior Vice President. After Dake was hired, DeFrancesco's husband voluntarily left his position with the University. DeFrancesco contends that Dake harassed and subsequently terminated him from his position because of his husband's speech. DeFrancesco sued Dake and University President Robert Robbins, alleging that they infringed upon his First Amendment right to be free from retaliation for his husband's allegedly protected whistleblowing speech.

The panel held that defendants were entitled to qualified immunity because it was not clearly established at the time of DeFrancesco's termination in June 2019 that defendants' adverse treatment of DeFrancesco on account of his husband's speech violated the First Amendment. In so

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

holding, the panel left for another day the merits of the underlying constitutional question of whether a public employee has constitutional protection from retaliation based on a close family member's speech, in this case a family member who is also a public employee.

Concurring, Judge Berzon wrote separately to explain that although the familial antiretaliation protection under the First Amendment was not clearly established at the time of DeFrancesco's termination, she would reach the first prong of the qualified immunity analysis and hold that such protection is well-grounded in Supreme Court and Ninth Circuit precedent. Judge Berzon would conclude that, taking the facts alleged in DeFrancesco's complaint as true and drawing all reasonable inferences in his favor, defendants violated DeFrancesco's constitutional protection against retaliation for his husband's speech.

## COUNSEL

Lauren M. Brody (argued), David W. Schecter, and Louis R. Miller, Miller Barondess LLP, Los Angeles, California; Jonathan A. Dessaules, Dessaules Law Group, Phoenix, Arizona; for Plaintiff-Appellant.

Daniel G. Dowd (argued), Cole K. Kubosumi, and Rebecca van Doren, Cohen Dowd Quigley, Phoenix, Arizona, for Defendants-Appellees.

**OPINION**

PER CURIAM:

From 2015 to 2019, Anthony DeFrancesco served as the Senior Director of Operations at the University of Arizona Health Sciences division. DeFrancesco's husband had earlier also held a high position at the University, as Senior Vice President and Chief Financial Officer. DeFrancesco contends that he was harassed and then fired from his job in retaliation for his husband's whistleblowing speech. DeFrancesco sued his supervisor and the president of the University of Arizona ("Officials"), alleging the Officials's retaliation for his husband's speech violated the First Amendment. At the motion to dismiss stage, the Officials invoked qualified immunity, arguing that First Amendment protection of public employees from retaliation because of a relative's speech is not clearly established. The district court agreed and dismissed DeFrancesco's complaint.

We affirm. The Officials are entitled to qualified immunity, as it was not clearly established at the time of DeFrancesco's termination in June 2019 that the Officials's adverse treatment of DeFrancesco on account of his husband's speech violated the First Amendment. In so holding, we leave for another day the merits of the underlying constitutional question—whether a public employee has constitutional protection from retaliation based on a close family member's speech, in this case a family member who is also a public employee.

## BACKGROUND[1]

### A

The University of Arizona Health Sciences ("UAHS") is a prominent academic medical center and public health department within the University of Arizona. Plaintiff Anthony DeFrancesco was the Senior Director of Operations at UAHS from 2015 to 2019; he eventually oversaw a budget in excess of $1 billion and served as the functional head of human resources for a staff of over 500 people. For most of this period, DeFrancesco's husband, Gregg Goldman, was a Senior Vice President and the Chief Financial Officer ("CFO") for the University.

In 2017, University President Robert Robbins put together a search committee to find a new Senior Vice President ("SVP") to run UAHS. Robbins requested that the University hire a particular executive search firm, Russell Reynolds, to assist the search committee. Several high-ranking employees of Russell Reynolds were close personal friends of Robbins. Goldman volunteered to serve as co-chair of the search committee.

Robbins encouraged Defendant Michael Dake to apply for the open SVP position. Robbins and Dake are both surgeons; they had worked together and attended medical conferences, athletic events, and music concerts together

---

[1] The facts in this section are drawn from allegations in the complaint. As this appeal comes to the Court from the district court's grant of a motion to dismiss for failure to state a claim, the Court assumes the facts alleged in the complaint are true and construes the complaint in the light most favorable to DeFrancesco. *See Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 998 n.1 (9th Cir. 2013).

over the years. Robbins calls Dake his "longest, best and dearest friend."

The University received many applications for the open SVP position. Dake entered the process late and did not perform well in his first interview. At the end of the initial round of interviews, Goldman drove Robbins to the airport. During the drive, in response to Robbins's inquiry, Goldman explained that Dake had performed poorly in his interview with the committee members and that the committee likely would not move him forward. Robbins replied that he was not concerned because it was "taken care of that Dake would be hired."

Later that same day, the committee members had a "robust discussion" about all the candidates, including Dake. A straw vote indicated Dake would not be advanced to the next round of consideration. But the committee members were concerned that voting Dake down might hurt their careers. At the suggestion of representatives from Russell Reynolds, the committee conducted an anonymous vote to avoid potential career repercussions. After tallying the votes, the Russell Reynolds representatives announced that Dake was one of the finalists. The committee members were surprised and asked the firm to disclose the vote counts. The firm refused. After some pressure, one of the firm's representatives said that "the vote had turned out how President Robbins wanted."

Dake's follow-up interview didn't go any better than the first. Interviewers concluded that, among other things, he lacked an understanding of the academic part of the job; had minimal experience running an academic department; was overconfident; and had allegedly engaged in unethical billing and research practices in the past. Goldman conveyed

these results and the (anonymous) views of the committee members to Robbins, who nevertheless declared Dake to be among the two finalists for the open position.

On March 2, 2018, Robbins met with other senior University officials, including Goldman, to discuss the SVP search. Robbins announced that he would extend an offer to Dake. Goldman spoke next, expressing concerns about the integrity of the hiring process. He stated that he believed the entire process was pre-planned by Robbins and that hiring Dake would be a serious mistake. According to DeFrancesco's complaint, Goldman was "blowing the whistle on an important issue for the community: corruption and abuse at the highest levels of the State's largest public university." The complaint states that Goldman did so in his capacity "as a private citizen, not as the CFO of the University and not as the co-chair of the search committee." Other officials also expressed concerns about Dake.

Robbins grew angry and wondered how he could "take it back," as he had "finally convinced [Dake] to apply and in essence ha[d] already offered him the job." Robbins then stormed out. His senior advisor said she had never seen him so angry and that Goldman and the others should be worried for their jobs.

In March 2018, Robbins hired Dake to serve as SVP of UAHS, which he celebrated as getting the "band back together again." Robbins told Dake that Goldman had firmly advocated against Dake's candidacy. Robbins also told Dake that Goldman's husband, DeFrancesco, was a UAHS executive and that Dake had the authority to fire him.

DeFrancesco had performed well during his tenure at UAHS, never receiving a complaint. But the tide began to turn after Dake became SVP of UAHS. With no explanation,

Dake told DeFrancesco he was fired and had to "reapply" for his job. Though DeFrancesco was not in fact let go at that point, Dake continued to subject DeFrancesco to targeting and harassment. Goldman complained to Robbins on behalf of DeFrancesco, and Robbins represented that he would handle the problem by speaking with Dake. But the targeting did not stop.

After that, Goldman voluntarily left the University. In October 2018, Dake refused to promote DeFrancesco to a position whose responsibilities DeFrancesco was already performing. Dake told DeFrancesco that now that his husband had left, DeFrancesco had a "decision to make," a statement DeFrancesco interpreted to mean that he was not welcome at UAHS as long as Dake was in charge.

Dake continued to make life difficult for DeFrancesco, undermining him in meetings with high-level executives, ignoring him, and circumventing him by communicating directly with his subordinates. After months of such treatment, Dake formally terminated DeFrancesco, effective June 30, 2019.

## B

In January 2020, DeFrancesco sued Robbins and Dake,[2] alleging that they infringed upon DeFrancesco's First Amendment right to be free from retaliation for his husband's allegedly protected whistleblowing speech.[3]

---

[2] Doe defendants were also named, along with the Arizona Board of Regents.

[3] In addition to his First Amendment claim, DeFrancesco alleged that the individual Defendants denied him equal protection by harassing and terminating him on account of his sexual orientation, and that the

DeFrancesco originally styled this claim as a violation of his First Amendment right of association with his spouse.

Robbins and Dake moved to dismiss DeFrancesco's complaint, arguing that DeFrancesco had failed to state a claim under the First Amendment and also invoking qualified immunity. The district court granted the motion. The court held, first, that DeFrancesco had not demonstrated that he had a clearly-established First Amendment associational right to be free from retaliation for the protected speech of his spouse. The district court acknowledged that some circuits and district courts had "found that retaliation against a public employee for the speech of a close family member violates the right to freedom of association," but concluded that "neither the Supreme Court nor the Ninth Circuit have clearly delineated the parameters of associational rights vis-à-vis a First Amendment retaliation claim." The district court also held that even if such a right were clearly established, Goldman's speech was not protected. According to the district court, Goldman spoke pursuant to his official duties on individual personnel manners, not as a citizen on a matter of public concern. Given these determinations, the district court concluded, Robbins and Dake were entitled to qualified immunity.

DeFrancesco appealed the ruling to this court. *See DeFrancesco v. Ariz. Bd. of Regents*, No. 21-16530, 2023

---

Arizona Board of Regents had discriminated against him on the basis of sex because of his sexual orientation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. These claims were dismissed, and their dismissal was affirmed on appeal. *See DeFrancesco v. Ariz. Bd. of Regents*, No. 21-16530, 2023 WL 313209 (9th Cir. Jan. 19, 2023). The Arizona Board of Regents is no longer a defendant.

WL 313209 (9th Cir. Jan. 19, 2023). We held, among other things, that the district court abused its discretion by denying DeFrancesco leave to amend his First Amendment claim to clarify whether Goldman was engaged in protected whistleblowing speech, and remanded the case for further proceedings. *Id.* at *2.

On remand, DeFrancesco filed a Second Amended Complaint ("SAC") alleging that Goldman spoke as a whistleblower on cronyism and corruption at UAHS. Also, whereas DeFrancesco's initial complaint asserted that Robbins and Dake had violated his First Amendment right of *association* by retaliating against him for his husband's First Amendment-protected speech, the SAC did not mention a right of association and instead asserted that Robbins and Dake violated the First Amendment by "harass[ing] and retaliat[ing]" against DeFrancesco because of his husband's protected speech.

The district court granted Robbins and Dake's second motion to dismiss, again based on qualified immunity. This time, the court held that the SAC alleged facts sufficient to plausibly allege that Goldman spoke as a citizen on a matter of public concern. But it once again held that there was "no persuasive law that clearly establishes that a First Amendment retaliation claim may be made by one person for the protected speech of another person based on a close personal relationship between the two." The district court also noted that the SAC did not assert the violation of a First Amendment right of association, and so did "not revisit its prior determination that there is no clearly established right of association under the First Amendment governing the circumstances of this case."

## DISCUSSION

We review *de novo* a district court's dismissal under Fed. R. Civ. P. 12(b)(6), "accepting as true all allegations of fact in a well-pleaded complaint and construing those facts in the light most favorable to the plaintiff." *Sampson v. Cnty. of L.A. ex rel. L.A. Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1018 (9th Cir. 2020) (quoting *Karam v. City of Burbank*, 352 F.3d 1188, 1192 (9th Cir. 2003)). And we review *de novo* a district court's decision on qualified immunity. *Id.*

In assessing whether qualified immunity applies, we consider whether (1) the plaintiff has plausibly alleged a violation of a constitutional right, and (2) the constitutional right was "clearly established" at the time of the alleged misconduct. *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018)). We may exercise our "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). As we conclude that DeFrancesco's constitutional protection from retaliation for a relative's speech was not clearly established by the time of his termination in June 2019, we do not reach the constitutional violation prong.

To meet the "clearly established" requirement, the law at the time of the conduct must have been "sufficiently clear" that every "reasonable official would have understood that what he is doing" was unlawful. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, "the focus is on whether the officer had fair notice that her conduct was unlawful, . . . judged against the backdrop of the law at the

time of the conduct." *Evans v. Skolnik*, 997 F.3d 1060, 1066 (9th Cir. 2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

A constitutional right may be "clearly established by controlling authority or a robust consensus of cases of persuasive authority." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) (citing *Wesby*, 583 U.S. at 63); *see also Waid v. County of Lyon*, 87 F.4th 383, 388 (9th Cir. 2023); *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023).[4] There is no binding precedent in this court governing the issue at stake here. In this circumstance, courts in this circuit may look to other decisional law, "including relevant decisions of other circuits, state courts, and district courts." *Moonin v. Tice*, 868 F.3d 853, 868 (9th Cir. 2017); *see also Evans*, 997 F.3d at 1066.

Not just any decisional law will do. "We have been somewhat hesitant to rely on district court decisions," *Evans*, 997 F.3d at 1067, for example, because they "do not necessarily settle constitutional standards," *id.* (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). And though we "have held that unpublished decisions . . . may inform our qualified immunity analysis," rarely have we concluded, "absent any published opinions on point or overwhelming obviousness of illegality," that "the law was clearly established on the basis of unpublished decisions only." *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002). Further, as the Supreme Court has repeatedly stated, clearly established law may not be defined "at a high level of

---

[4] On "rare" occasions, a plaintiff may demonstrate that his case is "obvious under existing general principles." *Waid*, 87 F.4th at 388. Contrary to DeFrancesco's assertions, this is not one of those occasions.

generality." *Evans*, 997 F.3d at 1067 (quoting *al-Kidd*, 563 U.S. at 742).

At the same time, qualified immunity "does not require a case directly on point" regarding the issue at hand. *White v. Pauly*, 580 U.S. 73, 79 (2017) (alterations omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Courts may apply clearly established legal standards to new fact patterns and, in appropriate circumstances, "rely on the intersection of multiple cases" to conclude that the unlawfulness of government officials' conduct should have been apparent to them. *Polanco v. Diaz*, 76 F.4th 918, 930 & n.8 (9th Cir. 2023). Still, the "contours" of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Put another way, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 104 (quoting *White*, 580 U.S. at 79).

With this standard in mind, we assess the landscape of on-point case law that existed at the time Dake and Robbins allegedly retaliated against DeFrancesco, using the date of DeFrancesco's termination—June 30, 2019—as the relevant temporal threshold.

1. There are a few decisions of the Supreme Court and the Ninth Circuit that are relevant to this case, but they do not clearly establish the unlawfulness of Dake and Robbins's conduct.

In *Thompson v. North American Stainless, LP*, the Supreme Court considered whether a company violated Title VII's antiretaliation provision when it fired plaintiff Eric Thompson because his fiancée, also an employee of the

company, had filed a sex discrimination charge with the Equal Employment Opportunity Commission. 562 U.S. 170, 173 (2011). The Court "ha[d] little difficulty concluding" that firing a non-speaking employee for his fiancée's legally-protected speech ran afoul of Title VII's antiretaliation provision. *Id. Thompson*, however, concerned a distinct statutory right, based on an antiretaliation provision that was "worded broadly." *Id.* at 175. Its statutory holding is not enough, on its own, to have clearly established DeFrancesco's constitutional protection.

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016), is also not entirely on point. *Heffernan* considered whether a city could constitutionally demote a police officer based on the mistaken perception of the officer's "overt involvement" in a particular mayoral candidate's campaign. *Id.* at 269. In truth, Heffernan was picking up a yard sign for his bedridden mother. *Heffernan* held that the demotion violated the officer's First Amendment right, as it was the government's retaliatory motive—not the employee's actual activity—that mattered in assessing the retaliation claim. *Id.* at 272-73. But unlike Heffernan, DeFrancesco does not allege or argue that Dake retaliated against him based on *DeFrancesco's* perceived speech. So *Heffernan*'s holding is not sufficiently apropos for qualified immunity purposes.

The most factually relevant Ninth Circuit precedent is *Biggs v. Best, Best & Krieger*, 189 F.3d 989 (9th Cir. 1999). In *Biggs*, an attorney and her family members alleged that their First Amendment protection against retaliation had been violated. *Id.* at 992-93. The attorney was fired from her position with a private law firm that served as city attorney after her family (and she herself) engaged in political activity. *Id.* at 992. Our court dismissed the case because Biggs qualified for the policymaker exception to First

Amendment protection for public employee speech, relying on *Fazio v. City of San Francisco*, 125 F.3d 1328, 1331-34 (9th Cir. 1997). We never opined on whether Biggs would otherwise have been "able to assert a First Amendment section 1983 claim" premised in part on retaliation for her family's First Amendment activities. *Biggs*, 189 F.3d at 994-95.

DeFrancesco cites several Supreme Court and precedential Ninth Circuit decisions for the proposition that the First Amendment prohibits government officials from retaliating against their employees for speaking out. *See* Appellant's Opening Br. at 29-30 (citing, *inter alia*, *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Nieves v. Bartlett*, 587 U.S. 391 (2019)); *see also id.* at 36-38; Appellant's Reply Br. at 9-11 (citing *Sampson*, 974 F.3d at 1020-21). But those cases cannot figure into our "clearly-established" analysis. Although the law is "settled that as a general matter," public employees enjoy protection from retaliation based on their *own* protected speech, *Hartman*, 547 U.S. at 256, applying this First Amendment principle to retaliation for speech by a family member does not represent the "mere application of settled law to a new factual permutation." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 784 (9th Cir. 2022) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1076 (9th Cir. 2009)). First Amendment retaliation cases in which the plaintiff, a protected speaker, was injured by the employer's actions do not clearly establish that a speaker's family member may not be retaliated against. Rather, speech-based retaliation against a non-speaking third-party implicates a different species of constitutional protection, the contours of which must be independently delineated.

2. Because binding precedents do not clearly establish DeFrancesco's First Amendment antiretaliation protection, we turn next to an array of relevant out-of-circuit and district court cases to evaluate whether there was, by June 2019, a "robust consensus of persuasive authority" establishing his constitutional protection. We conclude that there was not.

To begin, we note that some circuits have recognized that the First Amendment prohibits retaliation against a public employee for a family member's conduct or speech. *See Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999) (deriving the familial antiretaliation protection from the First Amendment right of intimate association); *Adkins v. Bd. of Educ.*, 982 F.2d 952, 955-56 (6th Cir. 1993) (same); *see also Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 516-17 (6th Cir. 2017) (deriving the familial antiretaliation right from the First Amendment's free speech guarantee); *Skalsky v. Indep. Sch. Dist. No. 743*, 772 F.3d 1126, 1129-31 (8th Cir. 2014) (assuming, without expressly addressing the issue, that retaliation against a public employee for his wife's speech is actionable under the First Amendment). And several district courts, including some in our circuit, have acknowledged that the First Amendment's antiretaliation protection for public employees may cover the relatives of those engaged in First Amendment-protected activity.**5**

---

**5** *See, e.g.*, *Freeman v. County of Riverside*, No. 18-2171, 2019 WL 7905733, at *5 n.2 (C.D. Cal. Apr. 5, 2019) ("[R]etaliation based on speech of a close family member is a right protected by the First Amendment in the Ninth Circuit."); *Isakhanova v. Muniz*, No. 15-cv-03759, 2016 WL 1640649, at *4-5 (N.D. Cal. Apr. 26, 2016) (acknowledging a "line of cases recognizing a cause of action where an individual has suffered retaliation for his or her perceived association with the speech of a close family member" and concluding that plaintiff

We turn next to the decisions that Dake and Robbins contend cast doubt on the doctrinal firmness of the variety of First Amendment protection here at issue. In one, *Gaines v. Wardynski*, 871 F.3d 1203 (11th Cir. 2017), a public school teacher alleged that her First Amendment free speech and intimate association rights were violated when she was denied a promotion after her father published an article in the local newspaper that criticized the school board and its superintendent. *Id.* at 1207-08. The Eleventh Circuit held that the government was entitled to qualified immunity because it was not clearly established at the time of the

---

had made out a viable retaliation claim based on her son's First Amendment activity); *Quesnoy v. Oregon*, No. 10-cv-1538, 2011 WL 5439103, at *11 (D. Or. Nov. 4, 2011) ("A retaliatory act taken against a person because of the spouse's conduct violates the First Amendment right of intimate association.") (citing *Adler*, 185 F.3d at 44); *Roberts v. Ferry County*, No. CV-07-149, 2008 WL 5121606, at *5, *7 (E.D. Wash. Dec. 5, 2008) (finding *Adler* persuasive and denying summary judgment on plaintiff's First Amendment intimate association claim that defendant retaliated against her based on her husband's conduct); *Gray v. Bruneau-Grand View Sch. Dist. 365*, No. CV-06-069, 2007 WL 1381785, at *1 (D. Idaho Mar. 27, 2007) (agreeing with *Adler* that plaintiff's claim of retaliation on the basis of her spouse's objection to school district policy should be analyzed as a violation of the First Amendment right of intimate association); *see also Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1302-04 (M.D. Ala. 2012) (holding that a daughter "raised a viable question of fact as to whether she was not rehired because of her association with her father and his speech," in violation of the First Amendment); *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 134-35 (D. Conn. 2010) (denying summary judgment on couple's First Amendment intimate association claim because plaintiffs marshaled enough evidence that public employee was disciplined for his wife's speech); *Fannon v. Patterson*, No. 13-cv-14, 2014 WL 4273337, at *4 (S.D. Ohio Aug. 29, 2014) (recognizing that plaintiff asserted a potentially viable First Amendment retaliation claim on the basis of his perceived association with his parents' speech).

alleged misconduct that the First Amendment prohibited adverse action against a public employee because of her father's protected speech or based on her familial relationship with her father. *Id.* at 1212-14.

*Gaines* is of mixed relevance here. It supports the notion that U.S. Supreme Court precedent had not clearly established the constitutional right at issue (at least as of 2013, when the relevant events in *Gaines* took place). And it specifically emphasizes that *Thompson*, which "is *not* a First Amendment case," did not "'clearly establish' that what [the government] did ran afoul of the constitution." *Id.* at 1211.

On the other hand, *Gaines* acknowledges that the First Amendment generally protects a public employee's right to intimate association from government reprisal, although the Eleventh Circuit did not pass on the underlying constitutional merits of the specific claims before it and rested its decision on the "more narrow" clearly established prong of the qualified immunity analysis. *Id.* at 1213. Also, to the extent the Eleventh Circuit applies a more restrictive standard than we do in determining whether a constitutional right has been clearly established,[6] its qualified immunity analysis is not entirely applicable in this circuit.

*Smith v. Frye*, a Fourth Circuit case Dake and Robbins cite as undermining doctrinal support for DeFrancesco's antiretaliation protection, is inapposite. 488 F.3d 263 (4th

---

[6] The Eleventh Circuit requires that a plaintiff point to case law from the "Supreme Court of the United States, the Eleventh Circuit, or the highest court in the relevant state" to show that a constitutional right was clearly established, *Gaines*, 871 F.3d at 1209 (quoting *Jones v. Fransen*, 857 F.3d 843, 851-52 (11th Cir. 2017)), whereas the Ninth Circuit recognizes that a constitutional right may be clearly established by a "robust consensus" of non-binding authority, *Tuuamalemalo*, 946 F.3d at 477.

Cir. 2007). *Smith* held that a public employee's First Amendment right to political association was not violated where her boss terminated her because of her son's political activity. *Id.* at 267-71. The court in *Smith* was not persuaded that there had been a constitutional violation, primarily because the employee's boss was "detach[ed] from the political process at play." *Id.* at 271. In the *Smith* court's view, the facts did not give rise to a reasonable inference that Smith was terminated as punishment for anyone's expressive conduct or political affiliation.

Still, there was enough uncertainty among appellate and district courts by June 2019 that the First Amendment protection from retaliation for a family member's speech was not "beyond debate." *al-Kidd*, 563 U.S. at 741. The Seventh Circuit had by then "reserve[d]" the question of whether "a public employer's refusal to hire a person because of animosity toward that person's spouse can []ever be actionable as a Constitutional claim." *Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 434 (7th Cir. 2010). Other circuits had not considered this issue head-on, or their unpublished or tangential precedents cast doubt on the position that the circuit would take with respect to the kind of First Amendment claim at issue here.[7] And some

---

[7] *See, e.g.*, *Burge v. Pearl River County*, 103 F. App'x 823, 826-27 (5th Cir. 2004) ("[T]he district court cited no decisional authority, and *we are aware of none*, to suggest that a right to raise a First Amendment claim based on a third party's 'public concern' speech was 'clearly established' for qualified-immunity purposes." (emphasis added)); *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 67-68 (1st Cir. 2015) (holding that a company that was denied a government contract "failed to establish a colorable claim for First Amendment retaliation" where, among other things, there was a "particularly attenuated relationship

district court decisions had held that appellate cases like *Adler*, which expressly recognizes a public employee's First Amendment protection from retaliation for the protected activity of his spouse, had not definitively settled the existence of familial antiretaliation protection under the First Amendment.[8]

Furthermore, to the degree DeFrancesco's antiretaliation protection is predicated on a First Amendment right to familial association, *see, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984); *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018), courts have identified ambiguity

---

between" the company and "the parties exercising First Amendment rights"—namely, the company's shareholder's relatives—and there was "no allegation that the denial of the [government] contract to [the company] was designed to or would have any material effect on the exercise of First Amendment rights by the relatives of shareholders").

[8] *See, e.g.*, *Vigil v. Tweed*, No. 18-829, 2019 WL 2411740, at *12 (D.N.M. June 7, 2019) ("*Adler* is not sufficient to clearly establish a general right under the First Amendment to be free of retaliation based upon the conduct of a family member."); *Robbins v. Merrell*, No. 15-cv-00156, 2017 WL 1628879, at *5 (D. Utah May 1, 2017) ("*Adler* sets forth no clearly-established right applicable here because it does not set forth the Tenth Circuit, Supreme Court, or majority view."); *Corkern v. Hammond City*, No. 11-1828, 2013 WL 4434417, at *4 (E.D. La. Aug. 14, 2013) (*Adler* "hardly constitutes 'a consensus of cases of persuasive authority'"); *Ballas v. City of Reading*, No. 00-CV-2943, 2001 WL 856627, at *4 (E.D. Pa. July 24, 2001) ("[T]he *Adler* court . . . acknowledged that the nature and extent of the right to be free of retaliation based on familial association is 'hardly clear,' and that courts have applied varying standards to determine the scope of such a right," and "[f]urthermore, the existence of a single case a different circuit . . . based upon a new and somewhat amorphous legal theory is insufficient to clearly establish that right.").

around the constitutional source of that right[9] and disagree about what it would take to establish its violation.[10] To be sure, some ambiguity about the "appropriate 'home'" for a constitutional right does not necessarily end the qualified immunity analysis if the right is otherwise clearly established in law; "[t]hat there is possible uncertainty as to the appropriate test does not immunize [a defendant] from liability." *P.B. v. Koch*, 96 F.3d 1298, 1303 n.4 (9th Cir. 1996). But here, the First Amendment protection against retaliation for a relative's speech was not otherwise so firmly delineated by the time of the alleged misconduct that we can overlook the doctrinal confusion about its source and content.

In sum, there was no binding precedent that clearly established DeFrancesco's constitutional protection from retaliation by June 2019, when he was ultimately terminated. And although there was authority favoring the recognition of the protection DeFrancesco claims here, at the time of his firing, it was not "settled law" that retaliation against a

---

[9] *See, e.g.*, *Matsusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 61 (2d Cir. 2014) (describing the "ambiguity of the right to intimate association"); *Adler*, 185 F.3d at 42 (explaining that the "nature and extent" of the First Amendment right of intimate association is "hardly clear").

[10] *Compare Muir v. Decatur County*, 917 F.3d 1050, 1054 (8th Cir. 2019) (explaining that the "key question" in a First Amendment right of intimate association case is "whether the government 'directly and substantially interfere[d] with the . . . right to enter and maintain [a] marital relationship,'" so state action having only a "collateral effect" on marriage will not amount to a constitutional violation (citation omitted)), *with Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 413 (6th Cir. 2011) (noting that in "cases challenging purported acts of retaliation that affect the right of marriage . . . the loss of a job because of a protected marital relationship 'constitutes undue intrusion by the state in that relationship'" (citations omitted)).

public employee for his relative's speech runs afoul of the First Amendment. *Wesby*, 583 U.S. at 63 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). As the contours of this protection were not sufficiently defined in June 2019, the district court correctly held that Dake and Robbins were entitled to qualified immunity.

## CONCLUSION

We hold today that, whether or not the First Amendment protects public employees from retaliation for a family member's speech, this principle was not clearly established at the time of DeFrancesco's termination. We therefore **AFFIRM** the district court's dismissal of DeFrancesco's Section 1983 claim.

---

BERZON, J., concurring:

In August 1953, Air Force reserve officer Milo Radulovich was at home with his wife and children when two uniformed men appeared at his doorstep. They were high-ranking Air Force officials who had come to tell Radulovich that, after ten years of service, he was being discharged from the military—but not because of his own conduct. Radulovich's commission was instead revoked because of his "close and continuing association" with his father, who was accused of subscribing to a pro-Communist newspaper, and his sister, who had participated in some political pickets and protests.[1] Radulovich fought back, launching a legal challenge to his termination that resulted in his reinstatement. He also became a "searing symbol" of

---

[1] Michael Ranville, *To Strike at a King: The Turning Point in the McCarthy Witch-Hunt* 3–6 (1997).

the "excesses of anti-Communism in the 1950s" when his story was featured on Edward R. Murrow's television program *See It Now*; the broadcast, some say, marked "the beginning of the end for the McCarthy era."**[2]**

This case is not nearly as dramatic as Radulovich's. But a case's subject need not be renowned, nor its facts extraordinary, to take on constitutional significance. At its core, DeFrancesco's termination raises the same question as Radulovich's: May the government discharge or otherwise disadvantage a public employee in retaliation for his relative's speech?

The First Amendment provides an answer. The "threat of dismissal from public employment is," and long has been, a "potent means of inhibiting speech." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968). Individuals are likely to refrain from speaking where the threat is against close relatives as well as where it is against themselves. The First Amendment thus, in appropriate circumstances, prohibits reprisal against a government employee based on his close relative's protected speech.

I write separately to explain why that is so. Even though the familial antiretaliation protection under the First Amendment was not clearly established at the time of DeFrancesco's termination, as our *per curiam* opinion concludes, I would reach the first prong of the qualified immunity analysis and hold that protection is well-grounded in Supreme Court and Ninth Circuit precedent. I also would conclude, taking the facts alleged in DeFrancesco's

---

[2] Douglas Martin, *Milo Radulovich, 81, Dies; Symbol of '50s Red Scare*, N.Y. Times (Nov. 21, 2007), https://www.nytimes.com/2007/11/21/us/21radulovich.html; *see also Good Night, and Good Luck!* (Warner Independent Pictures 2005).

complaint as true and drawing all reasonable inferences in his favor, that Dake and Robbins violated DeFrancesco's constitutional protection against retaliation for his husband's speech.

I

I begin by explaining why we should have addressed the constitutional merits in this case. Courts have "discretion to decide whether [the full two-step qualified immunity analysis] is worthwhile in particular cases." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). But that discretion is not without bounds. Like any other discretionary judicial authority, it may not be exercised whimsically. *Cf. U.S. v. Hinkson*, 585 F.3d 1247, 1259–61 (9th Cir. 2009). Rather, the Supreme Court and our court have developed principles that guide this court in determining whether engaging in the first-prong analysis is "worthwhile."

We consider, for instance, whether the court's guidance in a particular constitutional area is especially "needed." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019) (quoting *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc)). Relatedly, it makes sense to address the first prong where a decision could "[l]ay down a marker for future" litigation, *Olson v. County of Grant*, 127 F.4th 1193, 1203 (9th Cir. 2025), as opposed to where the "constitutional question is so factbound that the decision provides little guidance for future cases," *Pearson*, 555 U.S. at 237. The development of constitutional precedent is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* at 236. And there are other, more pragmatic factors to consider, such as whether the constitutional questions at issue have been adequately

briefed or the "precise factual basis for the plaintiff's claim" is hard to identify. *Id.* at 238–39.

These principles militate decisively in favor of conducting the first-prong, merits qualified immunity analysis in this case.

*First*, setting a constitutional precedent here would be clarifying for lower courts and "lay down" an important constitutional "marker" for future cases. Unlike several other circuit courts, *see* Per Curiam Opinion at 16; *infra* at 32–33, the Ninth Circuit has never squarely addressed whether the First Amendment protects a public employee from retaliation for a close relative's speech. But several district courts in our circuit have wrestled with this question from different angles, almost uniformly recognizing some basic First Amendment protection from retaliation under such circumstances. *See, e.g.*, *Vargas v. City of Tracy*, No. 2:22-cv-01454, 2025 WL 578475 (E.D. Cal. Feb. 21, 2025); *Freeman v. County of Riverside*, No. ED CV 18-2171, 2019 WL 7905733 (C.D. Cal. Apr. 5, 2019); *Isakhanova v. Muniz*, No. 15-cv-03759, 2016 WL 1640649 (N.D. Cal. Apr. 26, 2016); *Quesnoy v. Oregon*, No. 10-cv-1538, 2011 WL 5439103 (D. Or. Nov. 4, 2011); *Roberts v. Ferry County*, No. CV-07-149, 2008 WL 5121606 (E.D. Wash. Dec. 5, 2008); *Gray v. Bruneau-Grand View Sch. Dist.*, No. CV-06-069, 2007 WL 1381785 (D. Idaho Mar. 27, 2007).

The fact that district courts regularly grapple with the constitutional issue presented here suggests that guidance from our court is needed. We have the opportunity to provide a benchmark for future cases in this circuit. Also, by trying—as I attempt later—to provide a careful analysis of the various strands of pertinent authority, we would help develop consistent law *across* circuits. What's more, the

core question raised by this case—whether a public employee can in some circumstances be protected, under the First Amendment, from government retaliation for his relative's protected speech—is a generic constitutional issue, not an intensely "factbound" one.

*Second*, this case presents a question which does not "frequently arise in cases in which a qualified immunity defense is unavailable." *Pearson*, 555 U.S. at 236. The question of a public employee's First Amendment protection against retaliation for a family member's speech almost always arises in the context of a qualified immunity defense. Although a public employee in DeFrancesco's situation could in theory sue for injunctive or declaratory relief, *cf. Evans v. Skolnik*, 997 F.3d 1060, 1071 (9th Cir. 2021), in this kind of retaliation case, plaintiffs overwhelmingly seek monetary damages after having been disciplined, demoted, or fired.

*Finally*, this case presents an acceptable vehicle for us to provide some initial guidance to lower courts. The constitutional issues were adequately briefed by the parties, and the precise factual basis for DeFrancesco's claim is developed enough to allow us to set forth a preliminary framework for First Amendment familial antiretaliation claims, a framework on which future courts may elaborate.

In short, this case provides an appropriate and important opportunity for developing Ninth Circuit constitutional precedent on a recurring, generic legal issue. There will never be clearly established law on the pivotal and discrete question before us unless it is addressed in a case—such as this one—in which it is distinctly and adequately raised. The result of this vacuum will be that government bodies can continue to violate the First Amendment when similar

circumstances arise, as they will face no adverse consequences if they do so. It is therefore "worthwhile" to reach the first prong of the qualified immunity analysis.

In sum, rather than skirting the merits issue, the panel ought to have considered the contours of the constitutional protection DeFrancesco invoked and decided whether he plausibly alleged a violation of that protection. *Cf. Sampson v. Cty. of L.A. ex rel. L.A. Cty. Dep't of Child. and Fam. Servs.*, 974 F.3d 1012, 1023 (9th Cir. 2020). I do so now.

## II

DeFrancesco alleges that Robbins and Dake violated the First Amendment by retaliating against him for his husband's whistleblowing speech. The parties disagree about whether the First Amendment protects spouses or other close relatives under such circumstances. If it does, the parties contest whether DeFrancesco's complaint adequately alleged that Dake and Robbins violated this constitutional protection. I address each issue in turn.

## A

Under *Pickering* and its progeny, a public employee's *prima facie* First Amendment retaliation claim has three elements: (1) constitutionally-protected speech; (2) adverse employment action; and (3) a showing that the protected speech was a substantial or motivating factor for the adverse employment action. *Dodge v. Evergreen School Dist. 114*, 56 F.4th 767, 776 (9th Cir. 2022). At issue here is whether a plaintiff who has not himself engaged in First Amendment-protected speech can invoke First Amendment antiretaliation protection based on the speech of a close relative—in this instance, his husband, another public employee who had worked for the same institution. In my

view, such a plaintiff has a "hybrid" First Amendment retaliation protection "involv[ing] both speech and associational" elements. *See Hudson v. Craven*, 403 F.3d 691, 693 (9th Cir. 2005).

The first component of this hybrid First Amendment right is protected speech. The question at hand is whether the speech can be that of a close relative of the individual retaliated against.

"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). As a general matter, the First Amendment shields not only those who actually engage in protected activity but also those whose protected activity might be chilled due to an unconstitutional constraint. For example, "[f]acial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). And, although "[p]arties ordinarily are not permitted to assert constitutional rights other than their own" absent a showing of third party standing, *Wasson v. Sonoma Cnty. Junior Coll.*, 203 F.3d 659, 663 (9th Cir. 2000) (citing *NAACP v. Alabama*, 357 U.S. 449, 459 (1958)), courts assessing First Amendment claims often look beyond the directly affected individual and consider how restrictive government action might undermine the constitutional interests of other persons—for instance, listeners, *see, e.g.*, *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743–44 (9th Cir. 2021) (citing, *inter alia*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,

*Inc.*, 425 U.S. 748, 756 (1976); *Kleindienst v. Mandel*, 408 U.S. 753 (1972)), or persons who will be similarly situated to the plaintiff in the future, *see, e.g.*, *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 868–69 (9th Cir. 2016).

Of particular pertinence here, the Supreme Court has already widened the First Amendment's aperture to include protection for some public employees who have not themselves engaged in First Amendment-protected speech. *Heffernan v. City of Paterson* considered whether a city could constitutionally demote a police officer based on the mistaken perception that he had become "overt[ly] involv[ed]" in a particular mayoral candidate's campaign when, in truth, Heffernan was picking up a yard sign for his bedridden mother. 578 U.S. 266, 269 (2016). *Heffernan* held that the demotion violated the First Amendment, as it was the government's retaliatory motive—not the employee's actual activity—that mattered in assessing the retaliation claim. *Id.* at 272–73. "The constitutional harm at issue in the ordinary [First Amendment retaliation] case consists in large part of discouraging employees—both the employee discharged (or demoted) and his or her colleagues—from engaging in protected activities," the Court reasoned. *Id.* at 273. "The discharge of one tells the others that they engage in protected activity at their peril." *Id.*

Here, DeFrancesco did not engage in First Amendment-protected speech, nor does the complaint allege that Robbins or Dake believed that he did. But he was allegedly harassed and fired because of his husband's protected speech. Such retaliation undoubtedly would signal to other employees, as in *Heffernan*, that "they engage in protected activity at their peril," although the direct peril in this instance is harm to relatives rather than to themselves. *Id*. And as one district

court persuasively put the matter, the constitutional commitment to open debate "would be severely frustrated if the First Amendment did not include within its protective ambit an employee who bears . . . a close relationship with a person who engages in protected speech" because "[i]f the government could freely retaliate against such employees, there would be an 'obvious chilling effect on free speech.'" *Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1303 (M.D. Ala. 2012) (quoting *Reno v. ACLU*, 521 U.S. 844, 845 (1997)).

The Supreme Court has recognized a similar danger in the context of a retaliation suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. In *Thompson v. North American Stainless, LP*, the Court considered whether a company violated Title VII's antiretaliation provision when it fired plaintiff Eric Thompson because his fiancée, also an employee of the company, had filed a sex discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). 562 U.S. 170, 173 (2011). Like the First Amendment, Title VII protects certain kinds of employee expression, *cf. Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003): An employer may not discriminate against an employee who "oppose[s] any practice made an unlawful employment practice" under the statute, who files a charge with the EEOC, or who participates in an EEOC proceeding, 42 U.S.C. § 2000e-3(a). The *Thompson* Court "ha[d] little difficulty concluding" that firing a non-speaking employee for his fiancée's legally-protected speech ran afoul of Title VII's antiretaliation provision. 562 U.S. at 173. "We think it obvious," the decision explained, "that a reasonable worker might be dissuaded from engaging in protected activity if she

knew that" a "close family member," such as a fiancé, would be fired. *Id.* at 174, 175.

At the same time, *Thompson* cautioned that Title VII's protection against retaliation is not boundless; otherwise, "inflicting a mild[] reprisal on a mere acquaintance" of a protected speaker might trigger liability. *Id.* at 175. In the First Amendment context, a similar limitation flows from another facet of the First Amendment—the freedom of association—which helps place an outer boundary on the scope of the constitutional guard against retaliation for protected speech.

The Supreme Court has referred to the constitutional freedom of association in "two distinct senses": (1) as a right to *intimate* association, reflecting the freedom to "enter into and maintain certain intimate human relationships" without "undue intrusion by the State"; and (2) as a right to *expressive* association, reflecting the freedom to "associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition . . . , and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984).

The Fourteenth Amendment is "most often identified" as the "source" of the right to intimate association. *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1192 (9th Cir. 1988); *see also Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 458 (9th Cir. 2018). But the Supreme Court has made clear that the First Amendment-based right of association extends to family relationships, "emphasiz[ing] that the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not

only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987) (quoting *Roberts*, 468 U.S. at 619–20). We have echoed *Roberts*'s observation that "a single association may have intimate and expressive features and therefore be entitled to claim the protection of both the first and fourteenth amendments." *IDK, Inc.*, 836 F.2d at 1192; *see also Dible v. City of Chandler*, 515 F.3d 918, 929 (9th Cir. 2008). As the First Amendment protects "family relationships," we have "held that claims under both the First and Fourteenth Amendment for unwarranted interference with the right to familial association could survive a motion to dismiss." *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018).

Other circuits have also acknowledged that retaliating against a public employee based on the conduct of his family member may infringe on the employee's First Amendment right to associate with family members. The Second Circuit, for example, has held that the First Amendment right of association prevents the state from discharging an employee "for something as insubstantial as a public employer's discomfort about a discrimination lawsuit brought by [that] employee's spouse." *Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999). The Sixth Circuit has likewise recognized that firing a public employee based on her familial relationship may infringe on the employee's First Amendment associational right. *See Adkins v. Bd. of Educ.*, 982 F.2d 952, 953–54 (6th Cir. 1993); *see also Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400 (6th Cir. 2011); *Sowards v. Loudon County*, 203 F.3d 426 (6th Cir. 2000). The Eighth Circuit has entertained a public employee's claim that a school district violated his "First Amendment right to associate freely with his wife

when [it] changed his schedule in retaliation for her speaking at [a school] board meeting," although the court ultimately concluded that there wasn't a sufficient causal connection between his wife's expression and the adverse employment action to sustain the claim. *Skalsky v. Indep. Sch. Dist. No. 743*, 772 F.3d 1126, 1129–31 (8th Cir. 2014). And the Eleventh Circuit has noted that "a public employee can[not] be subjected to an adverse employment action for exercising [her First Amendment] right [to freedom of association]." *Gaines v. Wardynski*, 871 F.3d 1203, 1213 (11th Cir. 2017).[3] Although federal appellate courts have applied different standards to First Amendment familial association claims, *see* Per Curiam Opinion at 21 n.10, case law supports the principle that punishing a public employee based on displeasure with the protected conduct or speech of their family member is constitutionally problematic.

Weaving together the free speech and freedom of association strands of the First Amendment would allow this court to impose a reasonable outer limit on the scope of the constitutional protection against retaliation for the speech of a close relative. I would hold, in this case, that a public employee has a hybrid speech-associational protection against retaliation for a third party's First Amendment-protected speech. Without this rule, a government employer could exact retribution for protected speech in a way that impermissibly chills employees' exercise of their First Amendment rights. But to rely on this protection, the

---

[3] The Tenth Circuit has also observed, as a general matter, that "[a]ctions taken by a public official against a public employee because of animosity for the employee's spouse can in certain circumstances . . . unconstitutionally burden the marriage relationship" under the First Amendment. *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1440 (10th Cir. 1990).

employee-plaintiff should have a close familial association with the protected speaker. Without this limitation, "prohibiting reprisals against third parties" may "lead to difficult line-drawing problems concerning the types of relationships entitled to protection." *Thompson*, 562 U.S. at 174.

DeFrancesco is a former public employee who alleges he was harassed and fired for his husband's First Amendment-protected speech; marriage is, of course, "the most intimate of relationships." *Adler*, 185 F.3d at 44. I therefore would have concluded that DeFrancesco enjoyed some constitutional protection against workplace retaliation for his husband's speech.

## B

I next consider whether DeFrancesco's complaint plausibly alleged that Robbins and Dake's actions transgressed this constitutional protection. As earlier explained, for a public employee bringing a speech-based First Amendment retaliation claim under the *Pickering* doctrine to state a *prima facie* case, he must allege: (1) constitutionally-protected speech; (2) adverse employment action; and (3) that the protected speech was a substantial or motivating factor for the adverse employment action.[4] *Dodge*, 56 F.4th at 776.

---

[4] Ordinarily, for a public employee's speech to garner First Amendment protection under *Pickering* and its progeny, the employee must show, among other things, that his speech addressed a matter of public concern and was spoken in his capacity as a private citizen, not as a public official. *See Dodge*, 56 F.4th at 777. And once a *prima facie* showing of protected speech and retaliation is made, the court engages in balancing

As to the first element, the district court concluded that DeFrancesco's complaint raised an inference that Goldman's alleged whistleblowing speech was constitutionally protected under the *Pickering* standard. Dake and Robbins have expressly declined before this court to challenge that determination. So I assume its validity for the purposes of my analysis.

As to the second element, DeFrancesco alleges that he suffered adverse employment action in the form of a campaign of harassment and targeting, culminating in termination. On appeal, Dake and Robbins do not contest that these activities qualify as adverse employment actions.

---

to determine whether the government's legitimate managerial interests "outweigh[]" the employee's First Amendment rights. *Id.* at 781.

Where the state punishes a public employee for his relative's speech, it is not clear whether or how each element of the *Pickering* framework applies. For example, what if the relative were not himself a public employee? In that case, I tend to think the public concern test would not apply (and, of course, the relative's speech would necessarily be spoken in his capacity as a private citizen, for he holds no public office). Another complexity: if the plaintiff makes a *prima facie* showing of protected speech and retaliation on that basis, does the subsequent balancing between the government's managerial interests and the First Amendment protection focus on the speaker or the employee retaliated against? I would think the latter.

Whatever the answers to these questions, I need not, and do not, resolve these doctrinal intricacies. Goldman and DeFrancesco were government employees at the same institution, and the parties have throughout the course of this litigation proceeded on the understanding that Goldman's speech must satisfy the full panoply of requirements under *Pickering* for DeFrancesco to have a colorable *prima facie* First Amendment retaliation claim. I therefore proceed on that understanding as well.

Dake and Robbins do take issue with the third element, arguing that the complaint does not plausibly allege that either Dake or Robbins retaliated against DeFrancesco *because* of his husband's protected speech. The "substantial or motivating factor" element of a First Amendment retaliation claim "requires the plaintiff to show causation and the defendant's intent," *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 721 (9th Cir. 2022), meaning that the government defendant's "retaliatory motive" must be a "but-for" cause of the plaintiff's injury, *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019). In public employment First Amendment cases, establishing this causal connection may be as "straightforward" as evaluating whether "evidence of the motive and the discharge [i]s sufficient for a circumstantial demonstration that the one caused the other." *Id.* at 399 (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).

DeFrancesco alleges that he had a "stellar employment record," "did not receive a single complaint" about his work, and took on increasing responsibility during his tenure as Senior Director of Operations at the University of Arizona Health Sciences ("UAHS"). He also alleges that Dake began mistreating DeFrancesco soon after starting his new position as Senior Vice President ("SVP") at UAHS, which was, in turn, less than a month after Goldman spoke out about the irregularities in the hiring process. About a year later, Dake fired DeFrancesco. The absence of poor performance reviews, along with the temporal proximity between Goldman's protected speech, Dake's hire, and the targeting and firing of DeFrancesco, support the inference that Dake had a vendetta against DeFrancesco based on his husband's speech.

Further, DeFrancesco alleges that Robbins and Dake had long been extremely close friends; that Robbins told Dake that Goldman had been a "vocal and firm advocate against Dake"; and Robbins also told Dake that Goldman's husband "was an executive in UAHS and . . . Dake had the authority to fire him." DeFrancesco further alleges a specific instance when, after refusing to give DeFrancesco the formal title for the job that he had been effectively performing for more than two years, Dake told DeFrancesco that he had "'a decision to make' now that [his] husband had left the University." DeFrancesco alleged that the "manner, directness and tone of that statement made it clear to DeFrancesco that Dake wanted DeFrancesco to leave the University and that DeFrancesco was not welcome for as long as Dake was the head of UAHS." Dake's comment lends credence to the inference that Dake was targeting DeFrancesco for reasons connected to DeFrancesco's husband's speech during the SVP hiring process.

"[P]ut[ting] two and two together," *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001), these allegations give rise to a reasonable inference that Dake retaliated against DeFrancesco because he knew that Goldman had actively advocated against his candidacy.

Finally, the complaint plausibly alleges that Robbins participated in the retaliatory campaign against DeFrancesco. Section 1983 imposes liability both on persons who deprive a plaintiff of constitutional rights and on those who "cause[]" the plaintiff "to be subjected" to that deprivation. *Peck v. Montoya*, 51 F.4th 877, 888–89 (9th Cir. 2022). A Section 1983 defendant must, of course, be more than a "mere bystander." *Id.* at 889 (citation omitted). Where an official's individual actions do not "themselves rise to the

level of a constitutional violation," that official may be held liable under Section 1983 "only if [he] is an 'integral participant' in the unlawful act." *Id.* (citation omitted). There are at least two scenarios in which an official's conduct may render him an "integral participant": "those in which (1) the defendant knows about and acquiesces in the constitutionally defective conduct as part of a common plan with those whose conduct constitutes the violation or (2) the defendant 'set[s] in motion a series of acts by others which [the defendant] knows or reasonably should know would cause others to inflict the constitutional injury.'" *Id.* (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).

According to the complaint, Robbins was an "integral participant" in Dake's retaliation. Robbins told Dake that Goldman was a vocal and firm advocate against Dake, that DeFrancesco was a UAHS executive, and that Dake had authority to fire DeFrancesco. DeFrancesco alleges, on information and belief, that Robbins relayed this information with the intent that Dake harass DeFrancesco. The complaint also avers that Robbins either directly or implicitly encouraged Dake to retaliate against DeFrancesco, or, at a minimum, acted with callous disregard as to whether Dake would do so. Goldman allegedly complained to Robbins on DeFrancesco's behalf once Dake's retaliatory campaign began, so Robbins was aware of Dake's targeting of DeFrancesco. Yet the targeting and harassment did not stop.

Drawing all reasonable inferences in DeFrancesco's favor, these allegations plausibly demonstrate that Robbins knew about and acceded to Dake's unconstitutional conduct. Robbins, who had supervisory authority over Dake, was "made aware of the ongoing violation" of DeFrancesco's constitutional rights. *Riley's Am. Heritage Farms*, 32 F.4th at 724. He acquiesced in the retaliation by telling Dake about

Goldman's outspokenness, the relationship between Goldman and DeFrancesco, and Dake's position of authority over DeFrancesco. And he "failed to remedy" the situation by not intervening to end Dake's retaliatory conduct, although he knew of the conduct and had the authority to end it. *Id*.

As this court acknowledged in *OSU Student Alliance v. Ray*, university administrators who are aware of retaliation and do nothing to stop it can be liable for First Amendment violations under Section 1983. 699 F.3d 1053, 1075 (9th Cir. 2012). Alternatively, the allegations in the complaint demonstrate that Robbins "set in motion a series of acts" that he knew or should have known would cause injury to DeFrancesco. *Peck*, 51 F.4th at 891.

In short, DeFrancesco's complaint adequately alleges a causal relationship between the Officials's retaliatory motive and DeFrancesco's injury and includes sufficient allegations to implicate Robbins in the retaliation.

## III

In sum, I would have engaged in the first prong of the qualified immunity analysis, concluding that DeFrancesco had a First Amendment protection against retaliation for his husband's protected speech and that Dake and Robbins violated that protection. When our court unnecessarily skirts pressing constitutional questions in qualified immunity appeals, our jurisprudence becomes stagnant and unresponsive to litigants' concerns. In my view, where the opportunity presents itself to provide much-needed clarity to the legal community on a general legal question—that is, one not mired in the facts of a particular dispute—we should seize the chance to do so, especially when it comes to a constitutional interest as critical as free speech.

The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Lane v. Franks*, 573 U.S. 228, 235–36 (2014) (quoting *Roth v. U.S.*, 354 U.S. 476, 484 (1957)). "The right to speak freely . . . [is] one of the chief distinctions that sets us apart from totalitarian regimes." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966) (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)). Although assuredly not absolute, this right is such a "fundamental principle of the American government" that, as Justice Brandeis once warned, "order cannot be secured merely through fear of punishment for its infraction." *Sullivan*, 376 U.S. at 270 (quoting *Whitney v. California*, 274 U.S. 357, 375–76 (1927) (Brandeis, J., concurring)).

These foundational First Amendment tenets "remain[] true when speech concerns information related to or learned through public employment," and the Supreme Court has "cautioned time and time again that public employers may not condition employment on the relinquishment of constitutional rights." *Lane*, 573 U.S. at 236. And these principles should apply equally when, instead of taking aim at the protected speaker, the government takes aim at his family member. As Milo Radulovich's story shows, modern history is replete with examples of draconian government reprisal against kin of suspected dissidents, "subversives," or political "enemies."[5] The stakes of this particular case are

---

[5] *See, e.g.*, *supra* at 1 n.1, 2 n.2; Landon R. Y. Storrs, *Red Scare Politics and the Suppression of Popular Front Feminism: The Loyalty Investigation of Mary Dublin Keyserling*, 90 J. Amer. Hist. 491, 491–92 (2003); *see also, e.g.*, Timothy Snyder, *Bloodlands: Europe Between Hitler and Stalin* 72 (2010); Golfo Alexopoulos, *Stalin and the Politics of Kinship: Practices of Collective Punishment, 1920s-1940s*, 50 Comp.

admittedly not as dire. But if the First Amendment is to be a bulwark for democracy and against authoritarianism, it must cast a wide enough net to prevent indirect forms of retribution that undoubtedly and unjustifiably chill protected speech.

So: although First Amendment protections for public employees are subject to well-established constraints, *see, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Connick v. Myers*, 461 U.S. 138 (1983), both logic and law counsel that a government employer cannot fire or otherwise retaliate against its employees for no other reason than that it disapproves of the constitutionally-protected speech of an employee's close relative. Should a future opportunity arise to enshrine this principle in binding Ninth Circuit precedent, I urge our court to do so.

---

Stud. in Soc'y & Hist. 91 (2008); Cynthia Hooper, "Terror of Intimacy: Family Politics in the 1930s Soviet Union," *in Everyday Life in Early Soviet Russia* 65, 70–73 (Christina Kiaer & Eric Naiman, eds., 2005).